# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| R.M.M., a minor child, by and through her Mother and Natural Guardian, T.M., | Case No. 15-cv-1627 (SRN/HB) |
| Plaintiffs, | |
| v. | |
| Minneapolis Public Schools, Special School District No. 1; and Minneapolis Public School Board, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |
| Special School District No. 1, Minneapolis Public Schools, | Case No. 16-cv-3085 (SRN/HB) |
| Plaintiff, | |
| v. | |
| R.M.M., a minor child, by and through her Mother and Natural Guardian, T.M., | |
| Defendants. | |

Amy J. Goetz and Andrea L. Jepsen, School Law Center, LLC, 452 Selby Avenue, Suite 2E, St. Paul, Minnesota 55102, for R.M.M., a minor child, by and through her Mother and Natural Guardian, T.M.

Laura Tubbs Booth and Roseann Therese Schreifels, Booth Law Group, LLC, 10520 Wayzata Boulevard, Suite 200, Minnetonka, Minnesota 55305, for Minneapolis Public Schools, Special School District No. 1, and Minneapolis Public School Board.

SUSAN RICHARD NELSON, United States District Judge

# I. INTRODUCTION

This matter comes before the Court on three motions in the above-captioned related cases: the parties' cross-motions for judgment on the administrative record [Doc. Nos. 13, 16] in Case No. 16-cv-3085, and Minneapolis Public Schools' ("the School District") Motion for Judgment on the Pleadings [Doc. No. 96] in Case No. 15-cv-1627. For the reasons that follow the Court grants R.M.M.'s motion for judgment on the record, denies the School District's corresponding motion, and grants the School District's motion for judgment on the pleadings.

# II. BACKGROUND

## A. Factual History

These lawsuits arise out of the alleged failure of the School District to timely and appropriately identify and evaluate R.M.M. as a student with learning disabilities, and to provide her with timely and appropriate special education services. *See R.M.M. v. Minneapolis Pub. Schs.*, Nos. 15-cv-1627, 15-cv-1855 (SRN/HB), 2016 WL 475171, at *1 (D. Minn. Feb. 8, 2016). Briefly stated, the School District is a public school district serving approximately 36,000 students from pre-school to age 21. (*See* Compl. [Case No. 16-cv-3085, Doc. No. 1] ¶ 4.) In addition to its other responsibilities, the School District provides special education services to individuals in public, private, and home schools located within its geographical boundaries. (*See id.* ¶ 5.) R.M.M. is a minor who resides within those boundaries and who was voluntarily enrolled in Annunciation Catholic School ("ACS"), a private school within the district, from kindergarten through fifth grade. (*See id.* ¶ 8.)

During her time in elementary school, R.M.M. struggled academically, especially with reading skills. As early as the 2009-10 school year (R.M.M.'s first grade year), she began receiving individualized Orton-Gillingham reading instruction twice per week. (*See* Compl., Ex. 1 ("ALJ Remand Order") at 4.) At the beginning of her second grade year, R.M.M.'s mother, T.M., was advised by ACS staff that R.M.M. was not reading at an appropriate level. (*See id.* at 5.) T.M. subsequently met with Heather Zurell, the ACS Learning Specialist, who advised her to seek an assessment for R.M.M. (*See id.*) Options discussed apparently included seeking an assessment through the School District, or through another private school, Groves Academy. (*See id.*)

T.M. ultimately decided to bring R.M.M. to Groves Academy for an evaluation on December 3, 2010. (*See id.*) The resulting report concluded that R.M.M. had dyslexia and a Disorder of Written Expression, causing difficulties in reading and writing. (*See id.* at 6.) Based in part on the Groves Academy report, R.M.M. began receiving Title I reading services twice per week from teachers employed by the School District. (*See id.* at 7.) Title I services are publicly funded educational services for students at risk of academic failure or who have certain other needs. (*See id.*) R.M.M. continued to receive Title I services throughout her third and fourth grade years, culminating in 2.5 hours of specialized instruction per week during the 2012-13 school year. (*See id.* at 7-8.) T.M. also privately funded various after-school and summer tutoring programs for R.M.M. (*See id.*) Nonetheless, R.M.M. continued to have minimal academic success. (*See id.*)

Although this fact is disputed, the record suggests that the ACS Learning Specialist provided multiple reports to Dr. Carolyn Cherry, the School District official in

charge of Title I services, documenting R.M.M.'s struggling performance during her second, third, and fourth grade years. What is undisputed is that T.M. contacted Dr. Cherry in late 2012 to discuss R.M.M.'s performance and to ask for an increase in Title I services. (*See* ALJ Remand Order at 8.) Pursuant to that request, the School District received educational data from ACS in early 2013 indicating that R.M.M. had made little progress in reading during her time at ACS. (*See id.*)

At the beginning of R.M.M.'s fifth grade year, ACS staff referred her to the School District for a special education evaluation to determine whether she was eligible for services under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The evaluation report determined that R.M.M. was indeed eligible, and an Individual Service Plan ("ISP") was prepared. (*See id.* at 9-10.) R.M.M. began receiving services under the ISP on March 11, 2014. After only four sessions, however, T.M. withdrew her consent to continued special education services from the School District. (*See* Compl. ¶¶ 21, 22.)

Prior to the beginning of R.M.M.'s sixth grade year, ACS staff asked T.M. to remove R.M.M. from ACS, citing her lack of academic progress. (*See* Verified Compl. [Case No. 15-cv-1627, Doc. No. 1] ("R.M.M. Compl.") ¶¶ 93-95.) T.M. subsequently enrolled R.M.M. in a public school. (*See id.* ¶ 98.) Starting in seventh grade and continuing until the present time, R.M.M. has been enrolled at Groves Academy. (*See* ALJ Remand Order at 10.) The record demonstrates that she has made meaningful academic progress in her time at Groves, and has registered emotional improvement—in part reflecting her academic success. (*See id.* at 11.)

## B.    Procedural History

This dispute has a lengthy procedural history, and is now before this Court for the second time. *See generally R.M.M.*, 2016 WL 475171. On August 14, 2014, shortly after R.M.M. began her sixth grade year, T.M. filed a complaint with the Minnesota Department of Education ("MDE"), alleging that the School District had violated its location, identification, and evaluation obligations under the IDEA, as well as Section 504 of the Rehabilitation Act of 1973 ("Section 504"). *See id.* at *2. On October 6, 2014, T.M. amended the complaint to include a claim that R.M.M. had been denied a free appropriate public education ("FAPE"), as required by the IDEA, while she was enrolled at ACS. *See id.*

The matter was assigned to Administrative Law Judge ("ALJ") James Mortenson. On October 14, 2014, the ALJ dismissed as moot the child find claim because he determined that R.M.M. had indeed been identified, evaluated, and determined to be a child with a disability. *See id.* A due process hearing on R.M.M.'s FAPE claim was held in early December, 2014. *See id.* The ALJ issued his Findings of Fact, Conclusions of Law, and Order ("First ALJ Order") on January 2, 2015, concluding that the School District had denied R.M.M. a FAPE while she was a private student. *See id.* As a remedy, he ordered the School District to provide or pay for a set amount of additional instruction for R.M.M. in reading, writing, and mathematics. *See id.*

On March 27, 2015, T.M. initiated the first of the present lawsuits, seeking reversal of the ALJ's October 14 and October 17[1] orders dismissing the child find claim and the FAPE claim to the extent it arose prior to January 2014. *See id.* The lawsuit also asserted claims against the School District and the Minneapolis Public School Board ("the School Board") for discrimination in violation of the Americans with Disabilities Act ("ADA") and Section 504. *See id.* The School District responded with its own lawsuit on April 2, 2015, appealing the ALJ's January 2, 2015 due process hearing decision on the grounds that the ALJ lacked jurisdiction over R.M.M.'s FAPE claims, and had erroneously determined that R.M.M. was entitled to compensatory education. *See id.* The parties subsequently brought cross-motions to dismiss, and this Court issued its order on February 8, 2016. The Court denied the School District's motion, concluding that a parentally-placed private school student has an individual right to a FAPE and a due process hearing.[2] The Court granted T.M.'s motion, reinstated the child find and FAPE claims, and remanded those claims to the ALJ for a due process hearing. *See generally id.*

The ALJ issued his Findings of Fact, Conclusions of Law, and Order on Remand ("ALJ Remand Order") on July 1, 2016. He determined that the School District had failed to meet the child find requirements of the IDEA by, among other things, "fail[ing] to affirmatively seek out and identify [R.M.M.] as a child with a disability . . . ." (*See*

---

[1] On October 17, 2014, the ALJ had issued an order limiting R.M.M.'s FAPE claim to events occurring after January 2014. *See R.M.M.*, 2016 WL 475171, at *2.

[2] The School District has appealed the Court's dismissal of its lawsuit to the Eighth Circuit, and a decision on that appeal is currently pending.

ALJ Remand Order at 13.)  In the ALJ's opinion, the record demonstrated that the School

District's child find procedures consisted of little more than passively waiting for parents

or private school officials to make referrals for evaluations, which improperly "shifted

the burden of identification and location of possible children with disabilities" on to those

parents and officials.  (*Id.* at 17.)  As the ALJ noted:

> The School District never screened [R.M.M.] pursuant to its child find
> policy.  School District staff never made inquiries about [R.M.M.], her
> performance, and the reasons for her performance.  The School District did
> not propose to evaluate [R.M.M.] until the 2013-14 school year, following
> a referral from [ACS].  This is particularly surprising given that the School
> District was providing [R.M.M.] with Title I services to address her reading
> performance since second grade.  Yet, the School District never made
> inquiries about why [R.M.M.] required such services.  The School
> District's Title I coordinator testified that such an inquiry was not her job,
> even though she was a contact between the School District and [ACS]
> concerning specific struggling students.  Such an inquiry would have led
> the School District to a reasonable suspicion that [R.M.M.] may be a child
> with a disability and a written proposal to evaluate could have followed.
> Parent could then have consented to the proposal or rejected it.  Instead, the
> School District waited for Parent to approach it with a referral.  The fact
> that she did not do so prior to [ACS]'s referral in fifth grade is immaterial
> because the School District did not seek out Student and propose evaluating
> her to Parent.

(*Id.*)  As a remedy for this violation, the ALJ ordered the School District to reimburse

T.M. for the cost of the December 3, 2010 assessment at Groves Academy, as well as for

tuition and related services at Groves for the 2015-16 school year, amounting in total to

$21,145.  (*See id.* at 14.)  The ALJ also ordered the School District to pay to maintain

R.M.M. at Groves at least through the 2017-18 school year, as compensatory education

for at least three years of failure to properly identify and evaluate R.M.M. as a child with

a possible learning disability.  (*See id.* at 15.)

The School District subsequently appealed the ALJ's order to this Court on September 15, 2016. (*See generally* Compl.) It argues that the ALJ's determination that it violated its child find obligations was erroneous, affected by error of law, and unsupported by substantial evidence in the record. (*See id.* ¶ 55.) The School District further contends that the ALJ improperly failed to apply the appropriate statute of limitations to R.M.M.'s claims, and that his award of compensatory education was "arbitrary and capricious, representing the will of the ALJ rather than the law." (*Id.* ¶¶ 56, 57.) The parties now cross-move for judgment on the administrative record as to these issues. Finally, the School District argues that R.M.M.'s Section 504 and ADA claims must be dismissed because R.M.M. has not alleged bad faith or gross misjudgment, as is required by Eighth Circuit law. All three motions were argued to this Court on March 17, 2017, and the matter is ripe for decision.

## III. THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### A. Standard of Review

The IDEA provides that a party seeking review of an administrative decision may bring an action in federal district court. *See* 20 U.S.C. § 1415(i)(2)(A). The court must review the administrative record, hear additional evidence if requested, and grant such relief as is appropriate in light of the preponderance of the evidence. *See CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003); 20 U.S.C. § 1415(i)(2)(C). "Judicial review of agency action may be conducted on the administrative record even if there are disputed issues of material fact." *Indep. Sch. Dist. No. 283 v. S.D. by J.D.*, 88

F.3d 556, 561 (8th Cir. 1996).  The party challenging the decision under review bears the burden of proof.  *See E.S. v. Indep. Sch. Dist. No. 196*, 135 F.3d 566, 569 (8th Cir. 1998).

In reaching its decision, the reviewing court must give "due weight" to agency decision-making, because the ALJ had "an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review."  *CJN*, 323 F.3d at 636 (quotation and citation omitted).  The standard of review to be employed is thus less deferential than the familiar substantial evidence standard.  *Indep. Sch. Dist. No. 413, Marshall v. H.M.J. ex rel. A.J., M.N.*, 123 F. Supp. 3d 1100, 1107 (D. Minn. 2015).  As to questions of law, the court applies a *de novo* standard of review.  *See O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 699 (10th Cir. 1998).

## B. The School District's Child Find Obligations

In order that all children with disabilities may receive a FAPE, the IDEA imposes a "child find" obligation on school districts.  *See* 20 U.S.C. § 1412(a)(3).  Pursuant to this obligation, districts have a duty to ensure that:

> All children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are *identified, located, and evaluated* and a practical method is developed to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A) (emphasis added); *see also* Minn. R. § 3525.0750.  The IDEA defines children with disabilities in part as those children who "need[] special education and related services."  20 U.S.C. § 1401(3)(A)(ii).  The Supreme Court has recognized

the child find obligation as being of "paramount importance." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009).

As previously noted, the ALJ determined that the School District's efforts were insufficient to discharge its child find duties. He found that the School District's child find process for children in non-public schools "relies on referrals by parents and private school staff" to identify children suspected of having a disability. (*See* ALJ Remand Order at 12.) While the ALJ observed that the School District did conduct annual consultations with ACS staff, he concluded that these consultations were no more than "general," and "not focused on individual students." (*See id.* at 17.) Such "passive" efforts were not, in his view, in keeping with the affirmative duty imposed by the IDEA on school districts to seek out, identify, and evaluate children in need of disability services. (*See id.*) The ALJ made particular note of the fact that even though the School District was providing Title I services to R.M.M. from second grade on, it "never made inquiries about why [R.M.M.] needed such services." (*Id.*) Likewise, although the ALJ noted that the School District has developed a "tiered response-to-intervention process known as the Minneapolis Problem-Solving Model," the first step of which involves "universal screening of students for academic and behavioral needs," he found that R.M.M. herself was never screened using this model. (*See id.*) The School District's child find failure resulted, in the ALJ's opinion, in R.M.M. going nearly four years without the special education services necessary to provide a FAPE. (*See id.*)

In general, the School District does not contest that its child find endeavors were focused primarily on securing referrals from private schools and parents. (*See, e.g.*, Sch.

Dist.'s Resp. [Case No. 16-cv-3085, Doc. No. 28] at 5.) It simply disagrees with the ALJ's conclusion that such reliance was insufficient to discharge its child find responsibilities. In support, the School District relies primarily on the Third Circuit's decision in *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009). In what is, to date, the only circuit court opinion to expressly address the sort of activities a school district should undertake pursuant to child find, the *P.P.* court found that the West Chester Area School District had met its obligations through various measures it termed "comprehensive." 585 F.3d at 738. Among the activities the school district had undertaken were putting "notices in the general circulation newspaper" to inform parents about the availability of evaluations and the procedures for making an evaluation request; providing the same information on its website and on public access television; placing posters and pamphlets in both public and private school buildings; including information about evaluations in homeowner property tax bills; and training "principals and staff at private schools about the referral processes and child find issues." *Id.* at 731. The Third Circuit declared these activities to be "appropriate" under the requirements of the IDEA. *Id.* at 738. In the School District's view, the activities it engaged in were similar to those the Third Circuit found acceptable, and should garner similar treatment here. (*See* Sch. Dist.'s Mem. [Case No. 16-cv-3085, Doc. No. 18] at 21.)

On the record before it, the Court disagrees. Courts around the country, including this one, have recognized that the IDEA's child find requirement imposes an "affirmative duty" on school districts. *See, e.g. Strock v. Indep. Sch. Dist. No. 281*, No. 06-cv-3314

(JMR/FLN), 2008 WL 782346, at *7 (D. Minn. Mar. 21, 2008).  This duty is the sole

responsibility of the school districts—it may not be discharged simply by passing the

burden on to private school educators or parents. *See, e.g.*, *N.B. and C.B. v. Hellgate

Elementary Sch. Dist.*, 541 F.3d 1202, 1209 (9th Cir. 2008) ("A school district cannot

abdicate its affirmative duties under the IDEA."); *M.J.C. ex rel. Martin v. Special Sch.

Dist. No. 1*, No. 10-cv-4861 (JRT/TNL), 2012 WL 1538339, at *9 (D. Minn. Mar. 30,

2012) ("[S]chool districts cannot shift their assessment responsibilities to parents."); *N.G.

v. District of Columbia*, 556 F. Supp. 2d 11, 28 ("[E]ven though a parent may help a

school district satisfy the IDEA's requirement that it identify children in need of services,

the school district is not relieved of its requirement to further locate and evaluate those

children.").  The reason for this requirement is self-evident—private school officials and

parents may be unwilling or unable to recognize the need for an evaluation, and are under

no duty to assist the district.  *See, e.g.*, *M.G. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d

389, 397 (3d Cir. 1996) ("[A] child's entitlement to special education should not depend

upon the vigilance of the parents (who may not be sufficiently sophisticated to

comprehend the problem) . . . .").  Here, the passivity of the School District's child find

activities evidenced an abrogation of its responsibilities that the IDEA simply does not

permit.

    The School District counters that it should not be held liable, however, because—

whatever their objective faults—its child find procedures were successful in ensuring that

T.M. was notified of the option to have R.M.M. evaluated by the School District as early

as December 2010.  (*See* Sch. Dist.'s Mem. at 3, 21.)  What exactly was discussed in that

conversation between T.M. and the ACS Learning Specialist is subject to debate—T.M. insists that she was *not* told that the School District had a legal obligation to provide a free public evaluation. (*See* R.M.M. Mem. [Case No. 16-cv-3085, Doc. No. 15] at 5.) Even taking the School District's recitation of events as correct, however, the Court concludes—as the ALJ did—that it is immaterial whether T.M. was aware that she could have R.M.M. evaluated at public expense. (*See* ALJ Remand Order at 17 ("The fact that [Parent did not seek a public evaluation] prior to [ACS]'s referral in fifth grade is immaterial because the School District did not seek out Student and propose evaluating her to Parent."). "Even if a parent does not request an evaluation, a school district [still] has an obligation 'to identify and evaluate all students who are reasonably suspected of having a disability.'" *H.M.J.*, 123 F. Supp. 3d at 1108 (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.ed 260, 271 (3d Cir. 2012)). Again, relying on private school officials to refer parents to the School District for an evaluation is not—standing alone—a sufficiently active strategy to meet the IDEA's child find requirements.

In the Court's view, the Third Circuit's opinion in *P.P.* is not to the contrary. It is true that one portion of the West Chester School District's "comprehensive" child find program involved training private schools on how and when to make referrals, as the School District argues it has done here. *See P.P.*, 585 F.3d at 731. But beyond that point, the similarities between the two cases largely end. The record before this Court shows that beyond holding meetings with private school officials, the School District was content to take a passive role. In contrast, the West Chester School District actively sought to get its message *directly* to the community through public service messages in

different media, notices in tax bills and on its website, and posters and pamphlets in private schools. *See id.* In doing so, it neither relied solely on private school officials to carry its message nor passively waited for parents to contact it seeking information. Here, the School District's approach presents neither the comprehensiveness nor the proactive nature found in *P.P.*

More pertinently, however, extensive measures to notify parents and others about evaluation options are insufficient. This Court doubts, for instance, that the Third Circuit would have concluded that the West Chester School District had properly discharged its child find obligations if, despite all the public outreach efforts it undertook, it had still refused to initiate an evaluation of a child when presented with ample evidence of that child's possible disability. Yet, the record suggests that is exactly what happened here. R.M.M. received Title I services from the School District for *several years* without any School District official thinking to initiate a special education evaluation to see if she was eligible for services under the IDEA. Although the evidence is disputed as to just how much information School District received over the years, it is *not* disputed that T.M. contacted Dr. Cherry in late 2012 to discuss R.M.M.'s progress and ask for more Title I services. Despite that request, the School District did not conduct an evaluation of R.M.M. for more than a year, and then only after she was referred to the School District by ACS staff. In light of these facts, the Court can only conclude that the ALJ did not err in concluding that the School District failed to meet is obligation under the IDEA to

timely identify, locate, and evaluate R.M.M. as a child in need of special education services.[3]

### C.     The IDEA's Statute of Limitations

The School District next argues that the ALJ erred by improperly disregarding the IDEA's two-year statute of limitations when he ordered that "the Student will continue to be educated at [Groves Academy], at the School District's expense, as compensation for at least three years of not being properly identified and evaluated by the School District." (*See* ALJ Remand Order at 20.)  It contends that the IDEA only allows an ALJ to reach back two years from the date of the due process hearing request in fashioning appropriate relief.  Because the ALJ reached back three years, the School District contends that his decision was in error.  (*See* Sch. Dist.'s Mem. at 23-24.)

The IDEA statute of limitations requires a parent to request a due process hearing within two years of "the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint . . . ."  20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e).  The same two years are allotted to the parent to file an administrative complaint alleging a violation of the IDEA.  20 U.S.C. § 1415(b)(6)(B); 34 C.F.R. § 300.507(a)(2); *see also D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). Under this framework, it is undisputed that because T.M. first requested a due process

---

[3] In its brief, the School District contends that the ALJ erred by applying what it terms a "strict scrutiny" standard of liability to its failure to evaluate R.M.M. before her fifth grade year.  (*See* Sch. Dist.'s Mem. at 22-23.)  For the reasons discussed above, however, this argument is based on the flawed premise that the School District conducted appropriate child find activities, which it did not.  Accordingly, the Court sees no reason to conclude that the ALJ applied the wrong liability standard.

hearing on August 14, 2014, R.M.M.'s claims would normally be limited to the School District's conduct after August 14, 2012. *See D.K.*, 696 F.3d at 244.

Importantly, however, the IDEA provides that the statute of limitations "shall not apply to a parent" in two situations: (1) where the parent was prevented from requesting a hearing due to "specific misrepresentations by the local education agency that it had resolved the problem forming the basis of the complaint;" or (2) where the local educational agency withheld information from the parent that the law requires be provided to the parent. 20 U.S.C. § 1415(f)(3)(D). Before the ALJ, R.M.M. argued that at least the second of these exceptions applied here, and the ALJ agreed, noting that T.M. was not provided with notice of her procedural safeguards, as required by the IDEA, until January 2014. (*See* Admin. Record [Case No. 16-cv-3085, Doc. No. 25], Ex. 9 at 3.) *See* 20 U.S.C. § 1415(d) (requiring a copy of the procedural safeguards be made available to the parents of a child with a disability).

On review of the record, the Court also finds that the statute of limitations should not apply here because the School District failed to provide an adequate and complete notice of procedural safeguards as required by the IDEA and by applicable regulations. As the ALJ noted, the evidence suggests that T.M. did not first receive a safeguards notice until January 2014. Importantly, however, that notice contains *no information* regarding the time period within which T.M. could make a complaint. (*See generally* Admin. Record, Ex. P-56 (School District's notice of procedural safeguards).) Such information is required to be provided in the safeguards notice by the IDEA, and its absence renders the notice T.M. received procedurally deficient. *See* 20 U.S.C. §

1415(d)(2)(E) ("The procedural safeguards notice shall include a full explanation of the procedural safeguards . . . relating to . . . the opportunity to present and resolve complaints, including—the time period in which to make a complaint."); 34 C.F.R. § 300.504(c)(5). By withholding this critical information from T.M., the School District "denied [her] the knowledge necessary to request a due process hearing," *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 945 (W.D. Tex. 2008), and thus the ALJ did not err in considering the IDEA's limitations period inapplicable here. *See also D.G. v. Somerset Hills Sch. Dist.*, 559 F. Supp. 2d 484, 492 (D.N.J. 2008) (applying the withholding exception because the school district failed to provide a proper notice of procedural safeguards).

### D.    The Compensatory Education Order

In addition to its other claims, the School District contends that a comparison of the ALJ Remand Order with previous orders issued by the ALJ make clear that the ALJ Remand Order "is arbitrary and capricious, representing the will of the ALJ rather than the law." (Sch. Dist.'s Mem. at 26.) In particular, it points to two prior orders of the ALJ that it contends are inconsistent with the current decision: (1) the April 28, 2016 Order on School District's Motion to Dismiss [Case No. 16-cv-3085, Doc. No. 19 ("Schreifels Aff."), Ex. 1 ("ALJ Mot. to Dismiss Order")], which determined that a separate complaint filed by R.M.M. on March 3, 2016 against the School District was barred by the rule in *Thompson v. Bd. of Special Sch. Dist. No. 1*, 144 F.3d 574, 579 (8th Cir. 1998) (holding that student's failure to request a due process hearing before changing school district renders subsequent complaints moot); and (2) the First ALJ Order, which ordered

the School District to provide approximately seven months of compensatory education services as a remedy for violations of R.M.M.'s rights during her fifth grade year. (*See* First ALJ Order [Case No. 15-cv-1855 Doc. No. 1, Ex. 1] at 11-12.)

With regard to the ALJ Mot. to Dismiss Order, the School District makes two primary arguments. First, the School District argues that it is incongruent that in the that order, the ALJ found that *Thompson* operated to bar R.M.M.'s complaint, yet in the ALJ Remand Order concluded that R.M.M.'s claims were meritorious and deserving of relief. (*See* Sch. Dist.'s Mem. at 26.) This contention is without merit. Simply put, the facts before the ALJ on the School District's Motion to Dismiss were entirely different from those before him in the ALJ Remand Order, and there was thus no conflict whatsoever in the ALJ's reasoning in the two orders. More pertinently, this Court expressly found in *R.M.M.* that *Thompson* does *not* apply to the facts at issue here. *See R.M.M.*, 2016 WL 475171, at *10 ("[T]he Court finds that *Thompson* does not apply in this case."). Clearly, it was not error for the ALJ to follow this Court's instructions on remand.

Next, the School argues that the doctrine of *res judicata* applies to bar the ALJ's award of payment for tuition at Groves Academy for the years 2015-2018, because the ALJ previously granted the School District's motion to dismiss R.M.M.'s March 3, 2016 complaint. (*See* Sch. Dist.'s Mem. at 27.) But *res judicata* applies only where a party seeks to relitigate claims and issues that have previously been adjudicated. *See Johnson v. Vilsack*, 833 F.3d 948, 953 (8th Cir. 2016). Here, the claims raised by R.M.M. in her March 2016 complaint dealt solely with a perceived failure of special education in her sixth grade year, unlike those at issue in the ALJ Remand Order, which address the

School District's child find obligations during her second through fifth grade years. These claims are patently different, and thus *res judicata* has no bearing here.

With regard to the First ALJ Order, the School District notes that in fashioning the compensatory education relief awarded in that decision, the ALJ stated that his purpose was to "close [R.M.M.'s] achievement gap" that had deteriorated in part due to the School District's failure to propose an ISP that adequately met her unique needs. (*See* First ALJ Order at 11, 18.) Because the ALJ has now ordered substantially longer compensatory education than in the First ALJ Order, the School District argues that R.M.M. has received "a double and redundant award." (Sch. Dist.'s Mem. at 27.)

The Court again disagrees. As with the Motion to Dismiss order, the First ALJ Order was addressed to a different set of claims than were before the ALJ in the ALJ Remand Order. Most fundamentally, the ALJ was *not* considering R.M.M.'s child find claim, which he had previously dismissed. On remand, it is neither surprising nor improper for the ALJ to have reconsidered the scope of the compensatory education services necessary to fully compensate R.M.M. for the harm she has suffered based on the School District's FAPE violations. Taken on the whole, the Court thus finds the ALJ's compensatory education award in the ALJ Remand Order to be factually and legally sound, and it will not be disturbed here.

## IV. THE SCHOOL DISTRICT'S MOTION FOR JUDGMENT ON THE PLEADINGS

### A. Standard of Review

Federal Rule of Civil Procedure 12(c) provides that a motion for judgment on the pleadings may be brought after the pleadings are closed. A motion for judgment on the pleadings will be granted "only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004).

A Rule 12(c) motion is evaluated under the same standards as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The Court assumes the facts in the complaint are true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). The Court need not, however, accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that the plaintiff draws from the facts pleaded. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Finally, in considering a motion under Rule 12(c) "the Court must . . . generally ignore materials outside the pleadings." *Mickelson v. Cty. of Ramsey*,

No. 13-cv-2911 (SRN/FLN), 2014 WL 4232284, at *3 (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)).

### B.      R.M.M.'s ADA and Section 504 Claims

In counts II and III of her Verified Complaint, R.M.M. alleges violations of her rights under Title II of the ADA, as well as Section 504.  (*See* R.M.M. Compl. ¶¶ 122-151.)  Both statutes prohibit discrimination based on an individual's disability by public entities.  *See Gaona v. Town & Country Credit*, 324 F.3d 1050, 1056 (8th Cir. 2003).  To establish a *prima facie* case of discrimination under Section 504, R.M.M. must prove that she "(1) is a qualified individual with a disability; (2) was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) was discriminated against based on her disability."  *Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971 (8th Cir. 1999).  Likewise, a prima facie case of discrimination pursuant to the ADA requires proof that "(1) [R.M.M.] is a qualified individual with a disability; (2) [she] was excluded from participation in or denied the benefits of a public entity's service, programs, or activities, or was otherwise discriminated against by the entity; and (3) that such exclusion, denial of benefits, or other discrimination, was by reason of [her] disability."  *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998).

Although R.M.M.'s allegations relating to her ADA and Section 504 claims are extensive, the School District argues that it is entitled to judgment on the pleadings for a simple reason.  The Eighth Circuit has declared that, to prove discrimination in the education context under either statute, "something more than a mere failure to provide the 'free appropriate education' required by [IDEA] must be shown."  *Monahan v. Nebraska*,

687 F.2d 1164, 1170 (8th Cir. 1982); *see also B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013).  Rather, proof of discrimination in education requires a showing of "either bad faith or gross misjudgment" on the part of school officials.  *B.M.*, 732 F.3d at 887 (quotation and citation omitted).  In order to make that showing, "a plaintiff must show that the defendant's conduct departed substantially from accepted professional judgment, practice or standards so as to demonstrate that the persons responsible actually did not base the decision on such a judgment."  *Id.* ( quotations, citations, and brackets omitted).  Here, the School District contends that the Verified Complaint contains no allegations of "bad faith or gross misjudgment" on the part of any defendant sufficient to state a plausible claim for relief.  (*See* Sch. Dist.'s Mem. at 31-32.)

On review of the record, the Court agrees.  Although the Verified Complaint is lengthy, its allegations in regard to defendants'[4] allegedly discriminatory actions sound in negligence, not bad faith.  As the Eighth Circuit observed in *Monahan*, concluding, with the benefit of hindsight, that defendants could have taken other, more beneficial actions than they actually did "is not necessarily the same thing as holding that a handicapped child has been discriminated against solely by reason of his or her handicap."  682 F.2d at 1170.

Notably, R.M.M. does not appear to disagree that the Verified Complaint fails to allege bad faith or gross misjudgment, arguing in her brief not that the allegations in the

---

[4] Both the Section 504 and ADA claims are brought against the School Board as well as the School District.  The same reasoning that compels dismissal as to the School District applies to the School Board.

complaint are sufficient, but that it is improper to require such heightened pleading in the first place. (*See* R.M.M. Resp. [Case No. 16-cv-3085, Doc. No. 27] at 26.) In particular, she contends that the *Monahan* standard has been abrogated by intervening Supreme Court authority. (*See id.*) *See Alexander v. Choate*, 469 U.S. 287 (1985). Whether R.M.M. is correct in this assertion is not for this Court to decide—the Eighth Circuit has repeatedly affirmed the *Monahan* standard in the years since it was first propounded. *See, e.g.*, *B.M.*, 732 F.3d at 887.

Because the Court thus finds that the Verified Complaint fails to properly state plausible claims under the ADA and Section 504, it will grant the School District's motion for judgment on the pleadings as to both counts.

## V.     ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     R.M.M.'s Motion for Judgment on the Record [Case No. 16-cv-3085, Doc. No. 13] is **GRANTED**;

2.     The School District's Motion for Judgment on the Administrative Record [Case No. 16-cv-3085, Doc. No. 16] is **DENIED**; and

3.     The School District's Motion for Judgment on the Pleadings [Case No. 15-cv-1627, Doc. No. 96] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: June 27, 2017                              s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge